# 22ⁿᵈ JDC District Attorney's
# Summary of Investigative Findings
# in the Arrest and Death of Eric Nelson

_____

District Attorney Warren Montgomery

22ⁿᵈ Judicial District, Washington and St. Tammany Parishes

701 N. Columbia Street

Covington, LA 70433

985-809-8383

**Please Note:**

- La. State Police investigated Eric Nelson's death for 5-6 months and spoke to 27 witnesses. They obtained 11 search warrants and reviewed several hundred pages of documents.

- After investigation and review into the Eric Nelson case, the Louisiana State Police did not find that sufficient probable cause existed to pursue criminal charges against the Bogalusa Officers.

- The District Attorney's Office reviewed the State Police findings and performed additional investigation in the case.

- Bogalusa PD Surveillance Video - The time stamp on the top left corner on the surveillance video of Mr. Nelson's arrival at Bogalusa PD contains the wrong date and time.



The date reads 12-04-2021 Sat but should read 12-19-21 Sun. The time reads 01:37:21, but this is off by several hours; it should be closer to 12:00:00 (noon). The dispatch logs and EMS records were used to estimate the reported times as accurately as possible.

# District Attorney's Summary of Investigative Findings

- On Jan. 19, 2021, Eric Nelson was involved in a single car crash at 11:00 AM. Investigation shows that Nelson drove off the road, travelled 180 feet, did not slow down, did not apply his brakes and crashed into a ditch.

- At 11:04 AM, Washington Parish deputies located Nelson with his child near the crash and linked him to this accident; they arrested him on 2017 open drug warrants.



**Nelson's vehicle Crash Data recorder documented that:**

**1 - the accelerator was constantly deployed:**

**2 - no brakes were used, and**

**It does not appear that Nelson attempted to re-enter the roadway prior to going air-borne based on additional data.**

**Pre-Crash Data**

| Parameter | -5 sec | -4 sec | -3 sec | -2 sec | -1 sec | |
|---|---|---|---|---|---|---|
| Vehicle Speed (MPH) | 48 | 48 | 48 | 48 | 42 | ① |
| Engine Speed (RPM) | 1344 | 1344 | 1344 | 1344 | 1856 | |
| Percent Throttle | 7 | 7 | 7 | 9 | 15 | ② |
| Brake Switch Circuit State | OFF | OFF | OFF | OFF | OFF | |
| Accelerator Pedal Position (percent) | 20 | 20 | 20 | 23 | 47 | ① |
| Antilock Brake System Active (If Equipped) | No | No | No | No | No | |
| Lateral Acceleration (feet/s²)(If Equipped) | Invalid | Invalid | Invalid | Invalid | Invalid | |
| Yaw Rate (degrees per second) (If Equipped) | Invalid | Invalid | Invalid | Invalid | Invalid | |

| Parameter | -5 sec | -4 sec | -3 sec | -2 sec | -1 sec |
|---|---|---|---|---|---|
| Steering Wheel Angle (degrees) (If Equipped) | 0 | 0 | 0 | 0 | -16 |
| Vehicle Dynamics Control Active (If Equipped) | Invalid | Invalid | Invalid | Invalid | Invalid |

# Escape from Custody and Chase

- Washington Parish deputies agreed not to handcuff Nelson in front of his child and to drop the child off at his mother's house.

- At 11:19 AM, Washington Parish deputies contacted Bogalusa P.D. to meet them on Adams Road in order to turn Nelson over on the open warrants.

- When Bogalusa police arrived at 11:31 AM, Nelson, still un-cuffed, fled from police.

- A Bogalusa officer (2nd Officer) chased him through wooded terrain for over 300 yards.

- The 1st Bogalusa officer arrived by unit and assisted in the chase.



# The Chase and Capture



- The 2nd Bogalusa officer chased Nelson through woods, across a field and across Hwy. 439.

- The 1st and 2nd officers pursued Nelson across a brush and wooded terrain toward the Bogue Lusa Creek.

- Nelson entered the creek and crossed to the other side where he remained by a tree log on the opposite bank for 5-7 minutes.

- Officers at the scene pleaded with Nelson to return so that he would not become hypothermic in the 52-degree temperature.

- Nelson replied, "I can't." He also stated "I'm not going anywhere. I'm not running no more."

- The 2nd Bogalusa officer removed his gear and entered the cold creek (approximately 53- degree water temperature) to assist Nelson's return.

- The 2nd Officer was neck deep in the water as he brought Nelson (chest high) back across the creek where he was cuffed.

- Police allowed Nelson to rest after exiting the cold water because Nelson said "I can't breathe." The 2nd officer, also wet, tired and winded from the chase, said "I couldn't breathe in that cold water" either.

- Nelson refused to get up and assist the officers in walking back to the police units.

- When Nelson refused to cooperate, the 1st Bogalusa officer warned Nelson that if he did not cooperate, he would be tased.

- Nelson did not cooperate and a drive stun taser was used on Nelson's left leg for 3 seconds. This was done to get Nelson to comply with the officers attempts to get him up the muddy embankment of the creek.

- After the drive stun, Mr. Nelson said, "Okay I'm coming" and began walking with the officers.



The creek – location of arrest



View of the creek



View of 13' embankment from creek



Nelson was near the tree while police pled with him to return.

# Ushering Nelson to the Police Vehicles

- The officers and Nelson began to climb a muddy, steep 13' embankment. After several minutes and multiple attempts, they all reached the top of the embankment.

- Nearby eyewitness observed the officers' interaction with Nelson and heard Nelson say "I'm hurting" once, and "I'm not going back" multiple times. Officers reported Nelson claiming either, "I can't breathe" or he was "having trouble catching [his] breath," and variations of either "I can't walk" and "I won't walk."

- Police had to carry Nelson across 30-50 yards of wooded terrain filled with briars and brush. Nelson would walk, then drop to the ground, making officers carry him.



The brush area crossed.

- Upon exiting the woods near Hwy. 439,  witnesses observed Nelson with his head down, being assisted by police to the police units. These eyewitnesses also believed Nelson was not cooperating, stating he was either under the influence or purposely dragging his feet.

- As they were escorting Nelson to the car, an eyewitness observed Nelson drop to his knees and it appeared that he was not being cooperative. The 1st officer reported that he warned Nelson to cooperate and when he did not comply, he tased Nelson for 4 seconds.

- Officers then placed Nelson in the back of the unit but he would not put his legs inside. The 1st officer then tased Nelson on his leg for 2 seconds. Nelson pulled both legs into the unit and the door was shut.

- Based on the above, officers believed Nelson was not cooperating with their attempt to return Nelson to the police units for transport to the jail. Eyewitnesses at the scene reported the officers acted professionally.

# Driver Stun Taser Information

- Only a drive stun function of the taser was used in this case. The drive stun is not the same as a taser deploying probes into the body.

- The drive stun taser is applied to a 1.5-inch section on the body and causes local pain to that area only.

- The drive stun trigger pull automatically cycles a 5 second burst, which can be reduced by the officer once compliance is obtained.

- On each of the 3 uses, the Bogalusa officer deactivated the stun cycle after compliance was gained (in this case 3, 4 and 2 seconds respectively).

- Taser training of police officers allow for use of a drive stun to achieve pain compliance.

**Square Prongs on Drive Stun Taser 1.5 inches Apart (approximately 33.5 mm)**



# Taser Logs documents drive stun taser use

- Only the 1st officer used a drive stun taser on Nelson; in each use, the taser was turned off early once Nelson complied. (Taser Cycle- automatic 5 seconds)

- 11:43:42 AM Taser log - officer drive-stuns Nelson (near creek) in the left quadriceps for 3 seconds after he refused to get up to climb the embankment.

- 11:49:37 AM Taser log - officer drive-stuns Nelson for 4 seconds to the lower back when he wouldn't stand up to walk with the officers. Note: The officer believed Nelson was in the woods at the 2nd taser use but an eyewitness indicated it was used when they were near the police unit.

- 11:50:16 AM Taser log - Nelson refused to put his feet in the police unit and the officer drive-stuns Nelson for 2 seconds to the left leg.

# Transport to Bogalusa PD

- At 11:51 AM, Nelson was transported by a 3rd Bogalusa officer to the Bogalusa police station followed by the 2nd officer.

- Nelson asked the 3rd officer to open a window because he was having a hard time breathing. The 3rd officer cracked open a window and turned up the A/C.

- Nelson then requested the 3rd officer to "sit [him] up." (At approximately 2.5 minutes after leaving the scene.)

- The 3rd officer stopped the unit and, with the help of the 2nd officer, repositioned Nelson. Nelson said "yes, I'm good" to the officers and they continued to the police station.



- The 3rd officer made small talk during the trip to the PD and when asked why he ran, Nelson replied he "was scared."

- When the 3rd officer was close to the police station, Nelson said he could not catch his breath.

- The 3rd officer asked Nelson if he had an inhaler or other medical issue, but the officer did not hear a response as he pulled into Bogalusa PD station.

# Arrival at Bogalusa P.D. Captured on Video

- After arriving at the Bogalusa P.D., the 3rd officer again asked Nelson if he had an inhaler and Nelson said "unh unh".

- A Bogalusa jailer met the  3rd officer (speaking to Nelson at the rear door of his unit) but Nelson did not respond.

- The jailer opened the opposite door of the unit for Nelson to exit but he did not exit.

- The jailer pulled Nelson's legs out the vehicle, and then pulled Nelson from the vehicle where he collapsed to the ground.

- Within a minute of arrival at the PD,  the 3rd officer requested EMS to be dispatched in order to evaluate Nelson's condition.

- Officers performed a sternum rub to assess Nelson's medical state.

- They pulled him out of the driveway closer to the rear door of the station.

- Officers continued the sternum rub and checked for pulse and breathing.

- Officers placed Nelson in the recovery position (on his side) but could not perform CPR because Nelson had a pulse and was breathing.

- Within 2 minutes, police requested that the ambulance "hurry up."

- Another Bogalusa PD officer delivered smelling salts which were used on Nelson in an attempt to revive him, but he did not respond.

# Arrival of Emergency Medical Services (EMS) at Bogalusa PD

- EMS records reflect that they were dispatched at 12:02 PM and arrived at Bogalusa PD at 12:04 PM.

- At 12:05 PM, paramedics determined that Nelson was in agonal breathing (4 bpm), had a 120-heart rate and was unresponsive.

- Nelson's temperature was 101 degrees although he was in wet clothing and it was cold outside.

- EMS placed Nelson on a stretcher and monitored his pulse while they loaded him in the ambulance.

- While in the ambulance Nelson lost his pulse. EMS administered CPR, medicine and intubation.

- EMS departed at 12:18 PM and arrived at Our Lady of Angels Hospital at 12:21 PM.

- The EMS report indicates that they were informed Nelson had collapsed as he was walking from the police unit. This information is inaccurate.

- Follow up investigation revealed the information was obtained from an unknown law enforcement person at the scene during a short exchange with paramedics as they were walking toward or assessing Nelson. This information did not affect the paramedic's assessment nor treatment of Nelson. As such, it was concluded that the inaccurate information was not relevant to the medical assessment of Nelson nor did it affect their medical treatment of him.

# At Our Lady of Angels Hospital

- Nelson arrived at the ER in critical condition and in cardiac arrest.

- Nelson was placed on a ventilator and was given medicines to stabilize his heart rate. However, Nelson's heart rate varied between normal and high, and he had an abnormal heart rhythm.

- His body temperature was 100 even though he was in cold water for several minutes and in cold, wet clothing.

- Nelson had an abnormally high lactic acid reading which exceeded the testing limit range of the lab equipment.

- Over the next four hours doctors treated Nelson, who was stabilized but remained critical.

- CT and X-ray scans were normal.

- There were no large or traumatic injuries which could explain his condition.

- Medications were administered to lower his extremely high lactic acid levels.

- Nelson went into cardiac arrest again and CPR was administered, including multiple shocks and medication.

- After 45 minutes of CPR, Mr. Nelson was pronounced dead at 4:23 P.M.

- Doctors were perplexed at the profoundly high lactic acid levels, which they believed should not have been brought on by minor injuries or taser use.

# Autopsy Summary

Autopsy of Eric Nelson December 21, 2021
St. Tammany Parish Coroner's Office Report

- Mr. Nelson was 28 years old, 74 inches tall and 219 pounds.

- The Coroner noted 3 marks on the right lateral thorax which he believed to be consistent with stun gun injuries, along with minor abrasions on Mr. Nelson's body. These minor abrasions are consistent with his trips through the woods.

- Tox screen revealed no relevant drugs to explain Mr. Nelson's death.

- No significant injuries, trauma or bruising to his body were noted.

- After examination, Nelson had a structurally normal heart.

- There were no significant injuries to the neck or head area.

- No significant abnormalities were noted.

- Cause of death: "Fatal arrythmia due to exertional dyspnea," (shortness of breath).

- Manner of death: "Undetermined"

# Analysis of the Autopsy

- The hospital doctor and the autopsy pathologist were perplexed by the cause of Nelson's death.

- Two pathologists from the St. Tammany Coroner's Office reviewed the autopsy findings.

- The D.A.'s Office requested another pathology opinion from the Jefferson Parish Coroner's Office.

- After a review by all three pathologists, all agreed with the original autopsy findings.

- Because the manner of death is "undetermined," it does not qualify as a "homicide or accidental death" that would support a criminal prosecution.

# Further Medical Analysis

- The hospital doctor did not note any trauma to the back of Mr. Nelson's head during his examination.

- The pathologist autopsy did not note any injuries to the back of Mr. Nelson's head nor any significant trauma to his brain, consistent with a head injury which could have been caused by a significant impact on a hard surface.

- In reviewing the video at the Bogalusa P.D., at video footage stamped time 01:38:20, it appears that Mr. Nelson may have hit his head when he was removed and fell from the vehicle.

- Based on medical reports and discussions with medical professionals, because there was no injury to his head, it does not appear that this fall contributed to his death.

- Medical evidence received does not suggest that the drive stun use significantly affected the lactic acid level in Mr. Nelson's body.

# Taser Usage Analysis

- The drive stuns on Nelson while handcuffed did not appear to be unreasonable due to the totality of the circumstances.

- Nelson had run from police under dangerous and threatening circumstances over a long distance. He did not comply with the officer's requests to return across the creek. It appeared to officers that Nelson was not assisting nor cooperating with them while being carried across the wooded terrain back to the police unit.

- The difficulty presented to police under these rapidly occurring circumstances did not render the taser usage unreasonable. Officer #1 warned Nelson to cooperate before using the drive stun technique. And after each taser use Nelson did comply and cooperate.

# Taser Usage Legal Analysis

- Under the United States Supreme Court case of <u>Graham v. Connor</u>, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989), the court views an officer's use of force based on a standard of "objective reasonableness." Officer's actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." In evaluating the officers use of force, the courts take into account that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."

- The court further stated that the officer's actions involving use of force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he (suspect) is actively resisting arrest or attempting to evade arrest by flight."

- In the present case, Nelson was wanted for 2017 outstanding drugs warrants and fled from officers when Bogalusa police arrived to arrest him. This escape from police custody caused police to chase Nelson through difficult and dangerous terrain. Nelson put himself and officers at risk when Nelson entered and crossed the Bogue Lusa creek. Because Nelson was unable to return from across the creek after police pleaded with him to return, the 2nd Bogalusa officer placed himself in danger in order to recover Nelson from the opposite side of the cold and hazardous Bogue Lusa Creek.

- Officers and witnesses believed Nelson was not cooperating with police during the incident as well as during the difficult and strenuous route back to the police unit. The 1st officer deployed the taser drive stun technique 3 times, each time for less than the automatic 5 second cycle once Nelson complied. This deactivation of the drive stun demonstrates restraint in its use once compliance was obtained.

- Even though the events in the woods were not captured on body cams, eyewitnesses observing the rapidly unfolding events indicated the officers acted professionally during their observations in this incident.

- Based on the above, the taser use in this case was not unreasonable.

# Transport to the P.D.

- At 11:51 AM, a Bogalusa transport officer drove Nelson to Bogalusa P.D. approximately 6-7 minutes away.

- Approximately 2.5 minutes into the trip the transport officer pulled over to assist Nelson in sitting up.

- The transport officer spoke to Nelson during the trip to Bogalusa P.D. and did not note any other issues until shortly before arriving at the Bogalusa P.D.

- Just before arriving at the P.D. (approx. 11:57-58 AM), Nelson stated that he could not "catch [his] breath." Per the officer this was the first indication that Nelson was suffering from something other than exertion from the incident.

- Within one minute of arrival at the Bogalusa PD, EMS were requested.

- EMS arrived at 12:04 to evaluate and treat Nelson.

# Body Cams

- Washington Parish officers did not have department issued body cameras.

- The Bogalusa PD Officers had been issued body cams, which they are required to activate during arrests as per their policy.

- The policy requires that officers who fail to activate their body cameras during arrests explain why they were not activated.

- Investigators obtained and examined body cameras from the relevant Bogalusa PD officers and determined none were activated during Nelson's arrest.

- The Bogalusa Officers explained their failure to activate cameras below:

  - First Bogalusa Officer – camera was left on charging dock at police station.
  - Second Bogalusa Office - did not activate his camera due to the quickness of the unfolding events and chase.
  - Third Bogalusa Officer - did not activate believing he was only a transport officer and did not need to activate the camera.

- The events occurring by the creek and in the woods were observed by witnesses who corroborated the officers' actions. All indicated the officers did not engage in inappropriate behavior.

- The transport to the PD is not witnessed. However, none of the officers nor eye witnesses believed Nelson was struggling with a medical emergency immediately before his transport. It appeared he was uncooperative or under the influence.

- The transport to the PD likely took between 6-7 minutes, and within a minute of arrival at the PD the EMS were requested.

# DA Conclusion

- The actions above do not give rise to a chargeable criminal offense.

# Time line of the Eric Nelson
# Video Captured at the Bogalusa Police Station on
# December 19, 2021 beginning at approximately Noon

Note: Bogalusa PD Surveillance Video - The time stamp on the top left corner on the surveillance video of Mr. Nelson's arrival at Bogalusa PD contains the wrong date and time.



The date reads 12-04-2021 Sat but should read 12-19-21 Sun.

The time also is off. It reads 01:37:21 which is off by several hours; it should be closer to 12:00:00 (noon). Using dispatch logs and EMS records the reported times have been estimated as accurately as possible.

**01:37:26** The transport police unit driven by the 3rd officer arrives with Nelson at Bog PD., followed by a 2nd police unit occupied by the 2nd officer

**01:37:37** The 3rd officer goes to the rear passenger door and met by the jailer who exited the station to assist the 3rd officer.

**01:37:52**  The jailer along with another officer relocates to the rear driver's side door to assist in removing Nelson from the unit.  Nelson is not moving.

**01:37:59**  The jailor attempts to remove Nelson by pulling his legs out of the unit. Nelson is not moving.

**01:38:18** Nelson is removed from unit by jailer and Nelson collapses to the ground. (no head trauma observed by Drs.)

**01:38:25**  3rd Off.  relocates to see Nelson on the ground and appears to use Mic to call EMS

> Dispatch notes verified by dispatcher states the Police unit arrived at around 12:00 and EMS was requested at 12:00 – within one minute of arrival.

**01:38:32**  An officer rubs Nelson's sternum to asses Nelson's condition – he is unresponsive

**01:38:45 - 01:39:02** The jailor joined by another officer picks up Nelson  by his arms. They drag him to the front of the unit near the rear jail door claiming they need to move him out of the main driveway.

**01:39:02** Nelson is laid on the ground

**01:39:05** Officers roll Nelson over and then sit him up

**01:39:13** The 1st officer arrives at the station in his unit

**01:39:26 – 01:39:55** Another officer arrives as officers check Nelson and they appear to do another sternum rub

**01:39:56** Nelson laid on his back and put on his side in the recovery position (allow airway to open)

**01:40:15** The 3rd officer walks toward to rear station door (not clear on camera but he may be calling dispatch to expedite EMS)

**01:40:27 to 01:40:43** Officers are assessing Nelson

**01:40:54** Officers stand in front and another in the back to keep Nelson in recovery position.

**01:41:11** A jail officer exits the rear door to deliver smelling salts or use of Nelson – Officers says he winces but is unresponsive

**01:41:23 -47** A Wash. Parish officer arrives, appears to discuss with Bog. PD officers, and then pulls out his cell phone

**01:41:50** Cell phone call

Per Bog. Officers Nelson still has pulse and is breathing so no CPR can be administered. Nelson is kept in the recovery position

**01:42:35** EMS arrives at the PD. with stretcher to assess Nelson

**01:44:29** Other EMS arrive and join in assessment

**01:45:15** EMS place Nelson on gurney and pulse is monitored

**01:45:33 to 01:45:51** EMS is monitoring Nelson pulse (hand on neck) while he is taken to the ambulance

Nelson is off camera with EMS in the rear of the ambulance – Paramedics place Nelson on monitors where CPR and meds are administered and he is intubated to assist with his breathing.